GRASSELLI CHEMICAL CO. v. ÆTNA EXPLOSIVES CO., Inc.

(District Court, S. D. New York. January 5, 1918.)

CORPORATIONS ☞376—REPURCHASE OF STOCK ISSUED TO EMPLOYÉ—NOTE
FOR PRICE—RIGHT TO ALLOWANCE OF CLAIM.

Where a New York explosives company, employing an army officer as an
expert, agreed to give him $50,000 par value of its capital stock, with the
right to sell it back at the end of a year if he terminated his contract of
employment which was done, the company having no surplus from which
it could purchase its own stock under Penal Law, N. Y. § 664, and Stock
Corporation Law N. Y. § 28, and giving a note, in a following conserva-
tion receivership of the company the officer was not entitled to allowance
of his claim on the note as against creditors.

In Equity. Receivership suit by the Grasselli Chemical Company
against the Ætna Explosives Company, Incorporated, wherein Odus
C. Horney files a claim against defendant company in the hands of re-
ceivers. Claim denied.

Winthrop & Stimson, of New York City, for receivers.

O'Brien, Boardman, Harper & Fox, of New York City (Junius Par-
ker and Ernest R. Early, both of New York City, of counsel), for
claimant.

MAYER, District Judge. On April 20, 1915, defendant entered
into a contract of employment with Odus C. Horney, wherein it was
provided that for Horney's service to the company he was to receive
$10,000 a year for five years. At the end of one year, at Horney's
option, the contract could be terminated, and Horney was then to
have $40,000. It was further provided that Horney was to receive
$50,000, par value, of the capital stock of Ætna, with the right to
sell it back to Ætna at the end of a year. He was also to receive
$100,000, which the company deposited with the Columbia Trust Com-
pany in escrow. Prior to the making of the contract Horney was a
lieutenant colonel in the United States army, experienced in the manu-
facture of explosives for ordnance, and as Ætna was about to manu-
facture military explosives, the services of an able and experienced
man were needed.

It may fairly be inferred that the substantial terms agreed upon
were made partly in consideration of the fact that Lieutenant Colonel
Horney was about to give up his life work and his connection with
the United States army. After Horney had been in the employ of
Ætna one year, he elected to terminate his contract. He received the
$100,000 held in escrow; he delivered the $50,000 par value capital
stock to Ætna; he received the company's note for $90,000, of which
$40,000 was in payment of salary, and as security for this note he
received $110,000 in the bonds of Ætna. On February 13, 1917,
Ætna paid Horney $10,000 on account of his note, and on March 15,
1917, Ætna made Horney a further payment of $10,000 and gave him

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

its 30-day note in the sum of $70,000, secured by the $110,000 in bonds. On April 19, 1917, receivers of Ætna were appointed in this court in the above-entitled suit in equity.

On August 6, 1917, Horney filed with the receivers a proof of claim of a debt evidenced by the note of $70,000. The receivers now petition the court for instructions, asking that an order be entered directing that Horney's claim as to $20,000 shall be allowed and approved, and that the court advise and direct the receivers as to whether or not Horney's claim as to the further sum of $50,000 shall be allowed and approved, and for other and further germane relief.

There does not seem to be any question of fact involved, it being conceded, as I understand, that Ætna did not have any surplus at any of the times relevant to the question here involved. The receivers are instructed to allow the claims as to $20,000, and thus there remains for determination the matter of the $50,000.

Counsel for the contending parties are apparently in agreement as to some of the questions involved, and the result is that the point to be decided is whether Horney's claim shall be allowed after the claims of general creditors, and its payment be postponed until general creditors shall have been paid, or whether the claim cannot be allowed now, in view of the fact that Ætna has never had a surplus from the date of the making of the contract to the present time.

It is the law in many jurisdictions that a corporation may not purchase its own capital stock under any circumstances. In New York, however (and Ætna is a New York corporation), a corporation may purchase its capital stock from surplus profits. Penal Law (Consol. Laws N. Y. c. 40) § 664; Stock Corporation Law (Consol. Laws N. Y. c. 59) § 28; Cook on Corporations, § 311, p. 894; Morowitz on Private Corporations, p. 110; Machen, Modern Law on Corporations, p. 625; Williams v. Western Union Telegraph Co., 93 N. Y. 162; In re Fechheimer-Fishel Co., 212 Fed. 357, 129 C. C. A. 33; In re Tichenor-Grand Co. (D. C.) 203 Fed. 720; Hamor v. Taylor-Rice Engineering Co. (C. C.) 84 Fed. 392; Stevens v. Olus Manufacturing Co., 72 Misc. Rep. 508, 130 N. Y. Supp. 22; In re S. P. Smith Lumber Co. (D. C.) 132 Fed. 618. There are, however, a number of cases which seem to hold that under some circumstances a New York corporation may purchase its capital stock. Richards v. Wiener Co., 207 N. Y. 59, 100 N. E. 592; In re Castle Braid Co. (D. C.) 145 Fed. 224; Joseph v. Raff, 82 App. Div. 47, 81 N. Y. Supp. 546; City Bank v. Bruce, 17 N. Y. 507; Moses v. Soule, 63 Misc. Rep. 203, 118 N. Y. Supp. 410; Strodl v. Farish-Stafford Co., 145 App. Div. 406, 130 N. Y. Supp. 35.

There is not, however, anything in any of these cases which justifies the conclusion that a corporation may purchase any of its capital stock from funds other than surplus. An examination of the cases just above cited will show either that it was assumed that the company had a surplus or at least not shown that there was not a surplus or that the stock was purchased for purposes of reissue. It is pointed out in Stevens v. Olus Manufacturing Co., 72 Misc. Rep. 508, 130 N. Y. Supp. 22, that in Joseph v. Raff, 82 App. Div. 47, 81 N. Y. Supp

546, the transaction had been completed, and that the person who was to succeed the president of the company had already agreed to purchase the president's stock before the sale took place, and it further appears that the corporation purchased the stock for the purpose of reissuing it.

In view of what seems to be settled law on the subject, it is not urged that Horney's claim should be allowed and paid pari passu with the claims of general creditors. It is argued, however, that the purpose of the New York statutes (Penal Law, § 664, and Stock Corporation Law, § 28) was to protect creditors, and did not reach far enough to protect the corporation; i. e., the stockholders. I think, however, that this is too narrow a view. Obviously a purchase or repurchase of stock might (and in many cases would) afford to one stockholder an advantage over other stockholders of the same class, in addition to depleting pro tanto the assets of the corporation. The case at bar is a perfect illustration of this proposition, for, under the contract, Horney would receive $50,000 for stock which everybody familiar with the affairs of Ætna knows was not worth $50,000. To the extent, therefore, that $50,000 was in excess of the market value of the stock, a payment to Horney (where there was no surplus) would decrease the assets of the corporation to the detriment of other owners of stock of the same kind.

While, therefore, the purchase of capital stock is not wholly prohibited in New York, it must be limited to those cases and situations where payment therefor can be and is made out of surplus profits. At present there are not any surplus profits, and therefore the final question is whether Horney's rights are in any way enlarged by reason of the fact that the estate is in an equity receivership. The order appointing the receivers decreed:

"It is necessary for the protection and preservation of the respective rights and equities of the complainant and all other creditors of the defendant that the property and business of the defendant be preserved and administered," and the "receivers be and they hereby are authorized to continue, manage, and operate the business of the defendant until the further order of this court, with full authority to carry on, manage, and operate the said business."

No authority has been conferred upon the receivers to wind up the business of Ætna, or to distribute its assets to others than the creditors, or to make payments other than those that may become necessary for the purpose of carrying on the business or disposing of and clearing away litigations. The receivership at this juncture is what is generally spoken of as a conservation receivership; the hope being ultimately to turn the property back to the corporation, or, in other words, to the stockholders.

To allow the claim of $50,000 at this time would be premature, and in fact the court lacks power at present to allow the claim. If the property shall be turned back to the corporation, then the controversy will be one between Horney and Ætna, with which at this time we are not concerned. In order, however, to avoid any question to the effect that the status of the claim is now being determined in the event that, contrary to expectations, the receivership should become a wind-

ing-up receivership, it may be made plain, in the order to be filed on this opinion, that that question is left open, to be passed on if and when the occasion arises.

I have not discussed the question of estoppel due to performance, because that question is fully referred to in the concluding pages of my opinion in Bassick v. Ætna (D. C.) 246 Fed. 974, recently filed, and is covered by the cases of which McCormick v. Market Bank, 165 U. S. 538, 549, 17 Sup. Ct. 433, 41 L. Ed. 817, is an example.

As a transfer by Horney of the note or the collateral to an innocent purchaser may increase the indebtedness of the company, it is proper that Horney shall be enjoined from disposing of the note and the bonds collateral thereto until further application to the court on notice.